No. 13102

IN THE SUPREME COURT OF THE STATE OF MONTANA

1976

---

MELVIN FASSIO and MARITA JUNE FASSIO,
husband and wife,

Plaintiffs and Respondents,

-vs-

MONTANA PHYSICIANS' SERVICE,

Defendant and Appellant.

---

Appeal from: District Court of the Fourth Judicial District,
Honorable E. Gardner Brownlee, Judge presiding.

Counsel of Record:

For Appellant:

Hughes, Bennett, Cain and Stuart Kellner, Helena,
Montana
Alan Cain argued, Helena, Montana

For Respondents:

Garnaas, Hall, Riley and Pinsoneault, Missoula,
Montana
H. J. Pinsoneault argued, and Robert J. Riley,
appeared, Missoula, Montana

---

Submitted: March 3, 1976

Decided: MAY 11 1976

Filed: MAY 11 1976

Thomas J. Kearney
Clerk

Hon. W. W. Lessley, District Judge, sitting in place of Mr. Chief Justice James T. Harrison.

The Fassios are the parents of a daughter Marita, who is afflicted by a cytogenetic disorder known as Mongolism; they were members of the Montana Physicians' Service; their membership secured to them and to Marita coverage for enumerated hospital, medical and surgical services.

We are concerned specifically with three health coverage agreements running from April to April for the years 1971, 1972 and 1973. The treatments administered to Marita by the physician Dr. Turkel were on June 18, 1971, January 7, 1972, November 17, 1972 and finally on July 23, 1973. On August 4, 1971 the respondents were informed that the appellant would deny payment of the claim for the above services.

The case was tried to the district court without a jury. Before submission of the proposed facts, the judge issued what he termed "Opinions" that stated his position and decision; after submission of findings by the attorneys, the judge adopted his "Opinions" as the court's findings of fact and conclusions of law. The judge concluded that the respondent Fassios should be reimbursed in full for all the medical services performed for their infant daughter by Dr. Henry Turkel, M.D. of Detroit, Michigan.

Montana Physicians' Service appeals. Its appeal is premised on the proposition that the services so performed by Dr. Turkel for Marita were worthless and unnecessary and therefore not covered by the health agreements.

The district court's "Opinions" describe poignantly the Fassios' odyssey in treatment of their daughter in these words:

> "In January, 1970, the Plaintiffs herein suffered one of life's most unfortunate tragedies when their daughter was born with a chromosome defic- iency resulting in a condition commonly known as

Mongolism. They were immediately advised to
commit the girl to the Montana School for the
Retarded at Boulder, Montana; within a week
they were at that institution talking with Dr.
Philip Pallister, one of the country's leading
medical experts on Mongolism. Dr. Pallister
gave them a prescription which was based on his
experience and knowledge, and which would bring
about a one hundred per cent improvement in the
baby's future. That prescription was: 'Take the
baby home and give her lots of love and attention.'
The Plaintiffs have followed his advice and their
daughter's present physical, emotional and mental
state is witness to its effectiveness. After the
first year passed the Plaintiffs began more
earnestly to search for more help from the medical
profession. This search lead them to Dr. Henry
Turkel of Detroit, Michigan. * * *"

The record shows that the plaintiffs were referred to Dr.

Turkel by Dr. J. M. Law, M.D. of Missoula, Montana; that they

made their first visit to Dr. Turkel on June 28, 1971; his charge

was $750; and that this claim and his subsequent claims of $3,000

for reimbursement were denied by Montana Physicians' Service.

The appellant told the Fassios its denial was justified because

the services as performed by Dr. Turkel were at best "experimental"

and "unacceptable medical practice".

Chronologically and timewise, Dr. Turkel's treatments

of June 28, 1971 and January 7, 1972 are clearly within the ambit

of the April, 1971 contract; the treatment of November 17, 1972

is covered by the 1972 agreement and the final treatment of July

23, 1973 is under the time limit of the 1973 agreement.

We will discuss the three contracts separately. Consider-

ing the 1971 contract we cut through the verbiage and go directly

to the portion entitled "Group Major Medical Endowment." We find

the controlling definition of the covered medical expenses in

Subsection 1 of Section A in the following language:

" * * * usual, customary, and reasonable charges
incurred by a Member for necessary services per-
formed or prescribed by a licensed Doctor of
Medicine for an illness * * *."

Section C of the endorsement called Exclusions and

Limitations spells out the limiting or nullifying language on the coverage stated. The pertinent language of the exclusion states no benefits shall be provided for "services and supplies not incidental to or necessary for treatment of illness."

The provisions of the 1972 contract are identical with the 1971 agreement.

The basic provisions and exclusions limitation of both the 1971 and 1972 agreements limit reimbursement by the carrier, Montana Physicians' Service, to necessary services performed or prescribed by a licensed Doctor of Medicine. Dr. Turkel is a Doctor of Medicine and he, as a Medical Doctor, performed the services for Marita; a more compelling fact is that the Fassios were sent to Dr. Henry Turkel by referral of Dr. J. M. Law, M.D. of Missoula, Montana.

We look at the problem of characterization of the actual services performed by Dr. Turkel for Marita. The appellant describes those services as "worthless and unnecessary" and further of no real value in treating the conditions for which they were prescribed. It is admitted that the district court's "Opinions" are not complimentary as to Dr. Turkel's services and his fees shocked the court, but it does state:

> " * * * This illness, this birth defect calls for attention from a medical doctor just as much as any other terminal illness. It may even be that the medical attention can do nothing more than to assure the parents that everything is being done that can be done, but even this is important for the proper administration by the parents of Dr. Pallister's original prescription."

The notice of disallowance from Montana Physicians' Service signed by Dr. James J. McCabe did not call Dr. Turkel's services "worthless and unnecessary" and of no real value in treating the conditions for which prescribed, rather the services performed under the 1971 and 1972 contracts were described as "unacceptable medical practice" or "experimental."

- 4 -

We consider the word _necessary_. It is an adjective and therefore is a term of degree. Implicit in the use of the word _necessary_ in the area of medical services, as prescribed by a medical doctor, is the conclusion that such services are necessary and more particularly a _necessary_ expense when so prescribed or performed. An exhaustive search of cases and law review articles fails to give us an exact definition of the word _necessary_. In this context we might say the word _necessary_ is ambiguous, but we do not so hold as it is used in these contracts in the context of medical services performed or prescribed by a physician. In any event we must liberally construe it for the benefit of the party insured under these agreements. Travelers Ins. Co. v. American Casualty Co., 151 Mont. 198, 441 P.2d 177; Williams v. Ins. Co. of North America, 150 Mont. 292, 434 P.2d 395; St. Paul Fire & Marine Ins. Co. v. Thompson, 150 Mont. 182, 433 P.2d 795, 27 ALR 3d 1048; Jones v. Virginia Surety Co., 145 Mont. 440, 401 P.2d 570; Aleksich v. Mutual Acc. Ass'n., 118 Mont. 223, 164 P.2d 372, 162 A.L.R. 263.

The language of these insurance contracts was carefully chosen. This was done in the absence of the Fassios and used to carefully limit and protect the carrier, Montana Physicians' Service, against extended liability. If Montana Physicians' Service wishes to exclude or limit the risk contracted for, then let them do so in words that leave no doubt. The law is clear in this jurisdiction that exclusion clauses are construed narrowly against the insurer. Atcheson v. Safeco Insurance Company, 165 Mont. 239, 527 P.2d 549; State Farm Mutual Automobile Co. v. Partridge, 109 Cal.Rptr. 811, 514 P.2d 123.

We are dealing with group health insurance contracts. The coverage agreements for the years 1971 and 1972 provide reimbursable coverage to the Fassios for necessary medical services.

As in the instant case those services are prescribed and per-
formed by a licensed Doctor of Medicine. That should be and
is sufficient to meet the demands of the language of the 1971
and 1972 contracts.

The 1973 health coverage agreement concerns itself with
the services rendered on July 23, 1973. The language in this
agreement is in the main the same as the language contained in
the agreements of 1971 and 1972; there is however an interesting
change or addition. We find this change or addition in Sub-
section (J) of the exclusion article:

> " * * * and surgery or medical treatment which
> is experimental in nature or which does not
> constitute accepted medical practice." (Emphasis
> supplied.)

The appellant, Montana Physicians' Service, supplied this language
in the 1973 coverage agreement; the self-same language used in the
letters of James J. McCabe, Secretary of Montana Physicians' Ser-
vice. This specific change using the word "experimental" and the
phrase "unacceptable medical practice" specifically excludes the
services bargained for and paid for by the Fassios from Dr. Turkel
on July 23, 1973. It follows then that the rules of construction
as we have applied them on the agreements of 1971 and 1972 are not
applicable.

Considering the 1973 agreement it is stated in 55 A.L.R.
1246:

> "The group insurance contract is peculiar in that
> it is made by the insurer and the employer, in-
> stead of between the insurer and the insured, as
> in other contracts of insurance, thus affecting
> four parties,--the insurer, the employer, the
> insured, and the beneficiary. * * *"

The facts of the instant case clearly emphasize the pecu-
liarity of such an insurance policy. The first one in this series
of health agreements under which the Fassios were the beneficiaries
and Missoula County Courthouse, Missoula, Montana was the group-

employer continued its coverage from April 15, 1971 to April 15, 1972; the coverage was continued with an identical policy from April 15, 1972 to April 15, 1973; then suddenly and admittedly without notice to the beneficiaries, Fassios, the excluding word and phrase "experimental" and "unacceptable medical practice" were inserted.

It is elemental that no premium of /group insurance is valid unless it satisfies the applicable statutory requirements. Whitney v. Continental Life and Accident Company, 89 Ida. 96, 403 P.2d 573. The concern and supervision of the legislature is found in this pertinent portion of section 40-4102(2), R.C.M. 1947:

> "(2) A provision that the insurer will furnish
> to the policyholder for delivery to each employee
> or member of the insured group, a statement in
> summary form of the essential features of the
> insurance coverage * * *."

The mandate of this section is the protection of the beneficiary rights under a group insurance policy. It requires information and knowledge so the individual member of the covered group will know. True it relates to the agreement at its initial stage; but this basic and equitable "rule of notice" applies with equal force to the facts of the 1973 agreement. The even tenor of the 1971 and 1972 contracts was broken unilaterally as to the Fassios and their daughter Marita. It had a personal impact as the words of exclusion used were the very words used by Montana Physicians' Service in its notice of disallowance under the 1971 and 1972 contracts. Group life insurance case law does not allow such change without notice on the theory that a vested interest is involved. Fagan v. John Hancock Mutual Life Ins. Co., 200 F.Supp. 142, 144; Hayes v. Equitable Life Assur. Soc., 235 Mo.App. 1261, 150 S.W.2d 1113; (infra) Lindgren v. Metropolitan Life Ins. Co., 57 Ill.App.2d 315, 206 N.E.2d 734. The rule of group life insurance as to vesting, of course, will not apply here, but it

- 7 -

does indicate the concern of courts on group insurance.

In a group insurance situation as here surely there must be a notice to allow the beneficiary of such group insurance the opportunity to secure other coverage elsewhere; particularly where the risk is so specifically and abruptly excluded. Poch v. Equitable Life Assur. Soc. of United States, 343 Pa. 119, 22 A.2d 590, 142 A.L.R. 1279.

Hayes v. Equitable Life Assur. Soc., 235 Mo.App. 1261, 150 S.W. 2d 1113, is persuasive on this point. The facts in that case were that the group policy was renewed annually for the years 1927 - 1931 inclusive without change. In the year 1932 the contract was modified to exclude a disability clause. The company involved in the group insurance policy sent out booklets and letters and posted notices on the bulletin board that notified employees of the change. The beneficiary denied actual notice, as no letter had been sent to him personally; even under those facts the court held that the insured was entitled to coverage under the old policy; the court in effect held that the old policy remained in force as to that particular beneficiary.

It is not placing too large a burden upon the insurer Montana Physicians' Service to say that they, by the abrupt change in the 1973 contract without notice of any kind to the Fassios, in effect revived the terms of the 1972 contract by such failure to comply with the state law and with simple fairness and equity to the beneficiaries. The time span from April 15, 1973 (the beginning date of the 1973 agreement) to July 23, 1973 (the time the services were contracted with Dr. Turkel) was a mere 69 days. The Fassios under this group insurance policy had been paying monthly payments starting September 15, 1971 and continuing to and past July 23, 1973.

We do not hold by this decision as to the 1973 agreement that in group insurance coverage the individual group beneficiaries must have written personal notice with each change, but we do hold that in keeping with the thrust of section 40-4102, a summary form of the essential features of the change should be brought to the attention of the beneficiaries under the group insurance. Obviously a specific exclusion of coverage is such a change; equally obvious is that equity and fairness demand such knowledge be made available to the beneficiaries.

We affirm.

_____
Hon. W. W. Lessley, District Judge,
sitting in place of Mr. Chief Justice James T. Harrison.

We concur:

_____
_____
_____
Justices

- 9 -

Mr. Justice John C. Harrison concurring and dissenting.

I concur and dissent. Clearly the plaintiffs are entitled to coverage for the first visit made to Dr. Turkel. The reference was made by a licensed practitioner of this state and there was no way that they could determine that the treatment performed would be found to be "experimental" and "unacceptable medical practice" after the fact.

However, the visits thereafter followed notice by the appellant that such treatment would not be paid for, and the reasons why the services would be denied. Respondents, in spite of this notice continued treatment at their own risk. I would not authorize any recovery for the visits following the notice from appellant.

_____
John Conway Harrison
Justice