No. 80-453

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

RICHARD A. WEBER and JUNE WEBER,

Plaintiffs and Respondents,

vs.

BLUE CROSS OF MONTANA, a corporation,

Defendants and Appellants.

Appeal from: District Court of the Eighth Judicial District,
In and for the County of Cascade.
Honorable H. William Coder, Judge presiding.

Counsel of Record:

For Appellants:

Church, Harris, Johnson and Williams, Great Falls, Montana
Charles Lovell argued, Great Falls, Montana

For Respondents:

Regnier and Lewis, Great Falls, Montana
James A. Regnier argued and Thomas L. Lewis argued, Great
Falls, Montana

Submitted: September 15, 1981

Decided:    FEB  4 1982

Filed: FEB 4 - 1982

Thomas J. Kearney
                                          Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Richard and June Weber, plaintiffs and respondents, filed this action in the Seventeenth Judicial District, in and for Valley County, on February 7, 1974, seeking damages for contract benefits and wrongful cancellation by Blue Cross on their medical plan contract. On September 19, 1977, the case was transferred to the Eighth Judicial District in Cascade County. On February 9, 1979, Webers moved to add punitive damages for fraud, intentional infliction of emotional distress, and bad faith to their original complaint. Shortly before trial Webers also sought to add an additional claim alleging violation of the Montana Insurance Code. The case was tried June 23 through 27, 1980, and the district judge allowed the case to go to the jury on all issues of liability. The jury returned a verdict in favor of plaintiffs for every dollar in compensatory damages sought, $157,137, and for all but one dollar of the punitive damages, $999,999. Blue Cross filed motions for judgment notwithstanding the verdict, a new trial, and to amend or alter the judgment, all of which were denied. Blue Cross now appeals.

Richard and June Weber, plaintiffs-respondents, have nine children and live in Glasgow, Montana, where Richard Weber has a successful dental practice. Blue Cross of Montana, defendant-appellant, is a private, nonprofit health service corporation marketing health care plans throughout Montana.

In March 1972 Dr. Weber received an informational brochure describing the "Montana Dental Plan," a new group policy for Montana dentists. Dr. and Mrs. Weber reviewed

-2-

the plan, determined that it was less expensive than their current health insurance, and decided to apply for membership. Although every dentist in Montana could apply, only medically-qualified applicants were accepted.

On April 12, 1972, Jim Burke, a Blue Cross sales representative, met with Dr. Weber at his dental office to complete the membership application. Burke asked Weber questions and filled out the application form as Weber answered the questions. Dr. Weber checked the application for accuracy, and then both Weber and Burke signed the application.

The application, which Dr. Weber read once before signing, noted that "there will be a waiting period of 12 months for all preexisting conditions" and that "misrepresentations in this application will render the contract void." However, Dr. Weber was not given a copy of the application or the contract and was not advised that the application was part of the contract.

Dr. Weber specifically asked Burke if Blue Cross could cancel any member's policy without canceling the whole group plan, and Burke assured him that it was noncancelable. The contract, however, allowed Blue Cross to cancel upon thirty days' notice.

The "completed" application was then sent to Blue Cross for processing. Although the application requested the name of the family doctor, and the date, hospital, and physicians that had treated any medical problem, this information was not provided. Blue Cross nonetheless accepted the application and issued the Webers a membership card and a copy of the application on May 1, 1972. It is not clear

whether a copy of the contract was first sent to Webers on May 1, 1972, or in 1973 when their attorney requested one. In any event, Webers canceled their old insurance shortly after May 1, 1972.

On May 25, 1972, and in October 1972, June Weber was hospitalized in Glasgow for what was initially diagnosed as a bleeding ulcer. On both occasions the bills were sent to Blue Cross but were not paid.

In November 1972 June Weber went to Billings for extensive testing by Dr. Hurley, an internist. Dr. Hurley diagnosed varices of the esophagus (vericose veins in the esophagus) and a polyp in her duodenum (growth in the small intestine). This bill was also sent to Blue Cross but was not paid.

In April 1973 June Weber had another bleed, and an airplane was chartered to fly her to Billings for treatment. She had surgery for the esophageal varices. Again the bill was submitted to Blue Cross and was not paid.

Webers first became aware that bills were not being paid in August 1972 when Dr. Weber got a second bill for the May 1972 hospitalization. Dr. Weber contacted the local Blue Cross agent and was told that Blue Cross did not receive a bill. (In fact, Blue Cross had received the bill on June 22, 1972.) Dr. Weber asked the hospital to send Blue Cross another bill, but it too was not paid.

In March 1973 Dr. Weber wrote the Montana Dental Association, the Montana legislature and Blue Cross to complain about the trouble he was having with Blue Cross. In response to this letter, Blue Cross claims manager Nehus wrote on March 23, 1973, indicating that the April 12, 1972

application was reviewed, considered for cancellation, but retained. Blue Cross then denied payment on grounds of pre-existing conditions.

Blue Cross had originally received the May 1972 hospital bills on June 22, 1972. On July 14, 1972, Dr. Shull, medical director for Blue Cross, reviewed the bills and requested a copy of the hospital history from the Glasgow hospital in order to determine whether the claim was preexisting. Blue Cross received incomplete information, made several more requests for information, and completed its files on February 7, 1973, when it determined that June Weber's medical condition was preexisting.

On March 23, 1973, Blue Cross notified Webers that bills associated with esophageal varices would not be paid because the condition was preexisting. Then, on June 1, 1973, Blue Cross sent the Webers a letter unilaterally declaring the contract void because Dr. Weber had misrepresented his family's health on the application. This suit followed.

At trial there was voluminous testimony concerning whether or not June Weber's esophageal varices were pre-existing. In general, there was a great deal of evidence indicating that they were not preexisting, and little credible evidence indicating that they were preexisting. The point became moot, however, when Jury Instruction No. 12 was given, which indicated that a medical condition should not be considered preexisting unless it manifest itself prior to the effective date of insurance. All the evidence Blue Cross presented indicated that the condition may have existed, but the condition was unknown prior to May 1, 1972.

Therefore, Blue Cross admitted during closing argument that, based on the jury instructions, there were no preexisting conditions.

However, there continues to be a great deal of disagreement as to whether Dr. Weber misrepresented the health of his family when completing the application for membership in the Montana Dentists' Group Plan.

Dr. Weber did reveal that June Weber had a minor kidney infection twelve years earlier, that June Weber had her spleen and gallstones removed three years earlier, and that seven of his nine children wore glasses.

Medical conditions that Dr. Weber did not reveal include:

1. June Weber's familial (inheritable) anemia;

2. Dr. Weber's heart condition for which he occasionally took medication; and that Dr. Weber also suspected his son had a heart problem;

3. June Weber's continuing bladder trouble;

4. Removal of June Weber's ovary;

5. Five or six visits that June Weber had made to the local mental health center in the past year;

6. An ear infection and subsequent dizziness experienced by June Weber;

7. June Weber's chronic diarrhea;

8. Dr. Weber's hiatal hernia;

9. Son's dislocated shoulder;

10. Daughter's broken arm; and

11. Daughter's pneumonia.

In each case Blue Cross presented testimony indicating that these conditions constituted a "departure from good

health" and, therefore, it was a material misrepresentation to not disclose this information on the application.

Webers presented testimony that these conditions, as they affected the Webers, were not a departure from good health and that there was no reason to mention them on the application. Dr. Weber further testified that he considered it a personal judgment call and that in his personal opinion it was not necessary to list that information. In any event, Dr. Weber testified he told Burke about June Weber's hysterectomy and anemia and that Burke did not consider it important enough to record on the application.

Evidence was also presented at trial concerning past medical expenses, future medical expenses and emotional distress. Benefits the Webers would have received between May 1, 1972, and June 27, 1980, minus premiums, total $24,250. Currently, June Weber goes to Chicago once a year to treat her esophageal varices, which costs $3,500 a trip. Thus, future medical expenses are estimated at $47,887. Finally, the jury awarded $55,000 to June Weber and $30,000 to Richard Weber for emotional distress. Thus, the total for compensatory damages ($24,250 + $47,887 + $85,000 = $157,137) is $157,137.

Evidence was offered, and rejected, showing that Dr. Weber made similar "misrepresentations" on an application for Blue Shield membership following cancellation of the Blue Cross membership. Blue Cross also offered, and had rejected, evidence showing that Webers collected $13,000 from an American Dental Association plan obtained after the Blue Cross cancellation.

Six issues are raised on appeal:

-7-

1. Are health service corporations subject to the Montana Insurance Code?

2. Did the trial court properly deny the defense motion for directed verdict on the issues of actual and constructive fraud?

3. Did the trial court properly deny the defense motion for directed verdict on the tort of bad faith?

4. Did the trial court properly exclude evidence of insurance received subsequently to the Blue Cross policy?

5. Did the trial court properly refuse to allow Dr. Weber to be impeached with his subsequent Blue Shield application?

6. Was there sufficient evidence to support an award of $157,137 in compensatory damages and $999,999 in punitive damages?

I. INSURANCE CODE

Are health service corporations subject to the Montana Insurance Code? We hold they are not.

It is evident that the legislature did not intend health service corporations to be bound by the insurance code. First, in 1972, health service corporations were regulated by the attorney general, rather than the insurance commissioner. Section 15-2304, R.C.M. 1947, provided:

> "All health service corporations organized hereunder shall be subject to supervision by the particular professional board or hospital board or agency under which members or hospitals are licensed and they shall at all times be subject to examination by the attorney general on behalf of the state, to ascertain the condition of affairs of any such corporation, and to what extent, if at all, any such corporation may fail to comply with trusts which it has assumed or may depart from the general purposes for which it is formed, and

in case of any such failure or departure the attorney general shall institute, in the name of the state, the proceedings necessary to correct the same; all such medical, hospital or health service corporations heretofore organized and existing under the nonprofit corporation laws of Montana shall be subject to the provisions hereof . . ."

Second, health service corporations were specifically exempt from the insurance code by section 40-2611, R.C.M. 1947, which stated: "This code shall not apply to health service corporations, to the extent that the existence and operations of such corporations are authorized by section 15-1401 [now section 15-2301] and related sections of the Revised Code of Montana, 1947."

Third, the 1971 Legislature passed House Resolution 20 which recognized the unique status of health service corporations. HR 20, 1971, provides in part:

"WHEREAS, as of now, health service corporations are not under the jurisdiction of the insurance commissioner, and

"WHEREAS, the said corporations are not amenable to the insurance code, title 40, RCM 1947 . . ."

Fourth, the 1971 Legislature killed House Bill 253 which would have made health service corporations subject to the insurance code. We therefore conclude that the legislature, prior to 1972, did not intend health service corporations to be subject to the insurance code.

Further, Blue Cross was surprised by the late addition of the insurance code claim. Webers stated in their brief in support of the motion for leave to amend the complaint that, "plaintiffs are not alleging that a violation of the [insurance] code occurred." Yet, the pretrial order dated June 23, 1981, the day trial began, contained allegations of insurance code violations. Blue Cross was under-

standably surprised and prejudiced by this addition in violation of Rule 60(b)(1), M.R.Civ.P.

Appellant cites Harsh v. Blue Cross of Montana (1973), 162 Mont. 546, 514 P.2d 767, an order denying a supervisory writ, as supporting the proposition that health service corporations are not subject to the insurance code. However, section I, part 5, of the Montana Supreme Court Internal Operating Rules, provides that "Orders . . . shall not be . . . cited as authority in any subsequent proceeding." Thus, the Harsh decision is irrelevant.

Respondents cite Fassio v. Montana Physicians' Service (1976), 170 Mont. 320, 553 P.2d 998, as supporting the proposition that health service corporations are subject to the insurance code. However, briefs in that case made no reference whatsoever to the insurance code. Thus, the insurance code was not at issue, and any reference to the insurance code in the Fassio decision is purely dicta.

We conclude that health service corporations are not subject to the Montana Insurance Code and that Jury Instruction Nos. 17 and 19, binding Blue Cross of Montana to the insurance code, were erroneous.


II.  DIRECTED VERDICT ON ACTUAL AND CONSTRUCTIVE FRAUD

Did the trial court properly deny the defense motion for a directed verdict on the issues of actual and constructive fraud?  We hold the directed verdict was properly denied.

When deciding a motion for directed verdict, the trial judge must view the evidence in a light most favorable to the plaintiff.  Ferguson v. Town Pump Inc. (1978), 177

Mont. 122, 580 P.2d 915. No case should be withdrawn from the jury if reasonable men may differ as to the conclusions drawn from the evidence. Solich v. Hale (1967), 150 Mont. 358, 435 P.2d 883.

Representations designed to induce one to execute a contract must be made in good faith. State ex rel. Dimler v. Dist. Ct., Eleventh J.D., Etc. (1976), 170 Mont. 77, 550 P.2d 917, 921. If the representations are false, a cause of action would lie under (1) the "breach of obligation" theory of section 17-208, R.C.M. 1947, or (2) actual or constructive fraud theory, sections 13-307 to 13-309, R.C.M. 1947. See, Dimler, 550 P.2d at 921.

The evidence, viewed in a light most favorable to the respondents, indicates reasonable men could differ as to the conclusions drawn from the evidence. Burke allegedly represented the Blue Cross policy as noncancelable, yet it was canceled. Blue Cross brochures promised "comprehensive health care," yet claims were denied because of preexisting conditions that Blue Cross could not prove. Other examples exist, but the point remains the same: reasonable men could differ as to the conclusions drawn from the evidence. Therefore, the directed verdict was properly denied.

III. DIRECTED VERDICT ON BAD FAITH

Did the trial court properly deny the defense motion for directed verdict on the tort of bad faith? We hold the directed verdict was properly denied.

This Court noted in Dimler, supra, that when one party makes representations which induce a second party to enter into a contract, the first party's "representations

necessarily contain an obligation to act in good faith." 550 P.2d at 921. If the contract is subsequently breached, "[a] cause of action may sound in tort although it arises out of a breach of contract, if a defaulting party, by breaching the contract, also breaches a duty which he owes to the other party independently of the contract." First Sec. Bank of Bozeman v. Goddard (1979), 181 Mont. 407, 593 P.2d 1040, 1047, 36 St.Rep. 854. Goddard, unlike the instant case, involves an insurance contract, but the legal principles are the same. Blue Cross has an obligation to act in good faith with its members. This is especially true because Blue Cross is in a much better bargaining position than those applying for membership in its program. Usually the applicant has no voice in the preparation of the contract. Further, when a claim is filed, often the member "may be in dire financial straits and therefore may be especially vulnerable to oppressive tactics by [a health service corporation] seeking a settlement or release." Goddard, 593 P.2d at 1047.

In the instant case, the evidence viewed in a light most favorable to the respondents indicates that Blue Cross did not give Webers a written copy of their contract rights until the Webers hired an attorney. Further, Blue Cross, arguably, unreasonably denied the Webers' claims. Thus, reasonable men can differ as to the conclusions reached by the evidence, and the directed verdict was properly denied.

IV.  OTHER INSURANCE CLAIMS

Did the trial court properly exclude evidence of insurance received subsequently to the Blue Cross policy?

-12-

There is insufficient evidence in the record for this Court to decide this question, and we remand.

Blue Cross attempted to introduce evidence showing that $13,000 of Webers' medical bills were paid by an American Dental Association insurance policy received subsequent to the Webers' Blue Cross policy. Such evidence would affect not only compensatory damages for medical expenses, but also the claims for emotional distress and psychological pain caused by the mounting medical bills.

Is the new insurance relevant to the question of damages? Appleman's Insurance Law and Practice gives some guidance:

> "The measure of damages for a wrongful breach of insurance contracts must be determined on the facts of each case. . .
>
> ". . .
>
> "If the insured can secure insurance of a like character and value to that cancelled, the difference between the cost of carrying the cancelled insurance for the term stipulated and the cost of new insurance for a like term would be his measure of damages. It should, however, be insurance of precisely the same type in the same kind of insurer, since the cost of carrying insurance in a fraternal association would not be the same as that of an old line company." 20 Appleman, Insurance Law and Practice, §11255. (Emphasis added.)

There is insufficient evidence in the record to determine whether the new insurance is similar to the canceled Blue Cross policy. Therefore, we remand this issue to the trial court for consideration in light of this opinion.


V.  SUBSEQUENT INSURANCE APPLICATION

Did the trial court properly refuse to allow Dr.

Weber to be impeached with his subsequent Blue Shield application? We hold the impeachment was properly denied.

Immediately after Webers' Blue Cross policy was canceled, they applied for similar coverage from Blue Shield. On the Blue Shield application, Dr. Weber denied that anyone in the family had ever had anemia and stated that his wife's problem with varices (for which she is still being treated today) was corrected. At trial, Blue Cross tried to introduce the Blue Shield application to impeach Dr. Weber with a prior inconsistent statement, and to show Dr. Weber's state of mind when completing the Blue Cross application. Rule 801(d)(1), Mont.R.Evid.

Information contained in a subsequent application for insurance is not admissible. Continental Insurance Co. v. Clayton Hardtop Skiff (3rd Cir. 1966), 367 F.2d 230; Nicoll v. American Ins. Co. (1847), 3 Woodb & M 529, F. Cas. No. 10259.

Further, there is no convincing evidence that the Blue Shield application is inconsistent with the Blue Cross application. Dr. Weber testified that he told the Blue Cross agent, Burke, about his wife's anemia, and Burke chose not to put it on the application. There is also evidence that Dr. Weber gave the Blue Shield agent information which the Blue Shield agent chose not to write down. If the applications are not accurate, and not inconsistent, they cannot be used as evidence of a prior inconsistent statement. Rule 801(d)(1), Mont.R.Evid. The Blue Shield application was properly excluded from evidence.

## VI. DAMAGES

Was there sufficient evidence to support an award of $157,137 in compensatory damages and $999,999 in punitive damages? The errors noted above invalidate the judgment. Therefore, we need not address this issue.

However, it should be noted that the trial court admitted evidence concerning the purchase and sale by Blue Cross of the Rainbow Hotel in Great Falls, Montana. This was completely irrelevant, very prejudicial and likely to affect the jury's award of damages. See, Rule 402, Mont.R.Evid. The evidence should not have been admitted.

In summary, we hold that (1) Blue Cross is not subject to the Montana Insurance Code; (2) directed verdicts were properly denied on the issues of fraud and bad faith; and (3) evidence of Dr. Weber's subsequent application for Blue Shield coverage is inadmissible to prove intent. The trial court, with the benefit of additional evidence, shall rule on the admission of evidence concerning the $13,000 that the Webers collected from an American Dental Association health insurance policy. We do not reach the issue of damages.

We reverse in part, affirm in part and remand for a new trial consistent with this opinion.

_____
Justice

We concur:

_____
Chief Justice

_Serial B Daly_

_____

_____
Justices

Mr. Chief Justice Haswell specially concurring:

I concur in the result.

I would, however, hold that the District Court properly excluded evidence that $13,000 of Dr. Weber's medical bills were paid under a subsequent policy. The quotation in the majority opinion from Appleman's Insurance Law and Practice simply indicates that the difference in the cost of the new policy and the cost of the canceled policy is a proper item of damages if the insurance is comparable, not that the benefits paid under the subsequent policy are admissible in evidence.

_Frank I. Haswell_
Chief Justice

-16-

Mr. Justice Frank B. Morrison, Jr., dissenting:

I respectfully dissent.

With respect to the trial court's instructions No. 17 and 19, wherein the jury was instructed with respect to provisions of the Montana insurance code, the majority opinion frames the issue as follows: "Are health service corporations subject to the insurance code?" The majority concludes that Blue Cross is, as a health insurance corporation, not subject to the Montana insurance code.

I believe that the issue has been misstated. The issue is: "Is Blue Cross a health service corporation?"

Health service corporations are specifically exempt from the insurance code to the extent that their operations are authorized by statute. It should be noted parenthetically that Blue Cross failed to offer evidence showing it was engaging in statutorily authorized "health service" operations. Under the evidence in the record, the exemption for such organizations was not shown to apply. However, I feel we must not avoid the issue on this basis, but rather we should determine whether Blue Cross is, in fact, a "health service corporation" or whether it is an insurance company.

The court's instruction No. 17 provided:

> "You are instructed that a section of Montana law known as Montana Insurance Code requires that each group health insurance policy shall contain in substance the following provision:
>
> "'A provision that the insurer will furnish to the policyholder for delivery to each employee or member of the insured group, a statement in summary form of the essential features of the insurance coverage of such employee or member and to whom benefits thereunder are payable. If dependents are included in the coverage, only one certificate need be issued to each family unit.'

"If you find that Blue Cross of Montana violated this provision of Montana law by not including the provision in the policy of insurance issued to Richard and June Weber, no essential feature of insurance coverage not contained in a written statement delivered to a member of the Weber family may be enforced against Richard and June Weber."

The court's instruction No. 19 provided:

"You are instructed that a section of Montana law known as the Montana Insurance Code requires that each group health insurance policy shall contain in substance the following provision:

"'A provision that, in the absence of fraud, all statements made by applicants or the policyholder or by an insured person shall be deemed representations and not warranties, and that no statement made for the purpose of effecting insurance shall avoid such insurance or reduce benefits unless contained in a written instrument signed by the policyholder or the insured person, a copy of which has been furnished to such policyholder or to such person or his beneficiary.'"

If Blue Cross is an insurance company then instructions Nos. 17 and 19, quoted above, were proper instructions to be given in this case. Facts bearing upon this question are contained in the record. Section A-I of the Blue Cross policy states the various services available to subscribers at "member" hospitals. However, paragraph A-II states that Blue Cross will provide payment of 100% of the charges at any hospital which is registered with the American Medical Association or listed by the American Hospital Association. A subscriber is entitled to be "indemnified" for any hospital charges that the member should incur in any licensed hospital in the country. Section B of the policy provides for direct reimbursement to the subscriber for medical and surgical expenses. Section C of the policy provides for direct payment to the subscriber under a supplemental benefit plan. Section D of the policy provides for direct reimbursement under a major medical provision.

-18-

The subject of "indemnity" and its relationship to a determination of insurance carrier status was discussed by the California Supreme Court in People v. California Mutual Association (1968), 68 Cal.Rptr. 585, 441 P.2d 97. In that case, California Mutual was a non-profit, unincorporated association. Its stated purpose was to make payments in limited amounts for medical and hospital services rendered to its members using funds derived from periodic dues. Subscribing members were primarily enlisted from labor unions. There were approximately 1,500 members.

The question presented to the California court was whether California Mutual Association was an "insurer" or a "health care service plan." In resolving this issue, the California Supreme Court said:

> ". . . We, therefore, conclude that where indemnity is a significant financial proportion of the business, the organization must be classified as an 'insurer' for the purposes of the Knox-Mills Plan Act. The principle object and purpose test as enunciated in the California Physicians Service case does not provide for adequate financial security."

Prior to this 1968 decision, California determined whether a provider was a health service organization or an insurance company on the basis of "the principle object and purpose" of the corporation or association. In People v. California Mutual Association, this test was rejected and the Supreme Court determined that the insurance code governed if indemnity was a significant feature of the business.

Under either California test Blue Cross would be classified as an insurance company. Blue Cross makes payments directly to its policyholders, rather than making them to a member health care provider. This is, of course, indemnification. Indemnity is not only a significant proportion of the business, but it is the principle business of Blue Cross.

The more restrictive rule previously existing in California, that being the "primary purpose" rule, has been adopted and followed in a number of cases. For example, see Cleveland Hospital Service Association v. Ebright (Ohio 1953), 45 N.E.2d 157, aff. 49 N.E.2d 929; Associated Hospital Service v. Mahoney (1965), 161 Me. 391, 213 A.2d 712; Michigan Hospital Service v. Sharpe (1954), 339 Mich. 356, 63 N.W.2d 638, 43 A.L.R.2d 1167; Shapira v. United States Medical Services (1965), 15 N.Y.2d 200, 205 N.E.2d 293; State ex rel. Fishback v. Universal Service Agency (1915), 87 Wash. 413, 151 P. 768.

The undisputed evidence in this record shows that Blue Cross indemnifies its policyholders as a "primary" function of its business. Blue Cross, as it operates in Montana, is an insurance company whether we apply the "significant" test of California or whether we apply the "primary" test of other jurisdictions.

Instructions Nos. 17 and 19, set forth above, were properly given in this case.

I also dissent from Section IV. Other Insurance Claims, of the majority opinion. The quotation from Appleman's Insurance Law and Practice is not applicable. The authority cited in the majority opinion relates to the measure of damages for a wrongful breach of insurance contract. The issue in this case is whether the trial court erred in refusing to admit evidence of a collateral source where such evidence might be relevant to a determination of emotional distress suffered by the plaintiffs. The defendant contends that this otherwise inadmissible collateral source evidence should be admitted because, since the medical bills were paid by other insurance, the plaintiffs did not suffer the

mental and emotional distress claimed.  This is a close question.

The trial court was faced with a situation where the fact of plaintiffs' medical bills being paid by another insurance carrier was a collateral source and under our rules of evidence not admissible.  On the other hand, such payment may have been relevant to a determination of whether the plaintiffs in fact suffered the degree of mental and emotional distress claimed.  The trial court made a determination that the prejudicial effect of admission outweighed any probative value the evidence had.  I would affirm this discretionary ruling on the part of the trial court.

The majority admonishes the trial court to not receive evidence concerning the purchase and sale by Blue Cross of the Rainbow Hotel in Great Falls, Montana.  This is consistent with the majority's holding that, as a matter of law, Blue Cross is a health service organization.  In my view, Blue Cross, as a matter of law, is an insurance company.  However, if the status of Blue Cross were to be determined a jury issue, its dealing in real estate would be relevant to a determination of whether, in fact, Blue Cross was a "health service organization."  The evidence is overwhelming, including the evidence of its real estate dealing, that Blue Cross operated as an insurance company and not as a "health service organization."

I would affirm the plaintiffs' judgment.

Justice

-21-

Mr. Justice John C. Sheehy, dissenting:

I join with Justice Morrison in his dissent, and I wish to make a further statement concerning the flat holding of the majority that "Blue Cross is not subject to the Montana Insurance Code."

It will come as a bit of surprise to Blue Cross premium payers, including several thousand state employees, that the contract under which they make premium payments, or have them deducted from their paychecks, is not a health insurance policy, but something else that looks very much like insurance.

It is said that in Eden, Adam was given the job of naming all the animals. When he named the elephant, he was asked "Why elephant?" Adam responded, "Well it looks like an elephant."

The Blue Cross contract looks so much like insurance that the majority in its opinion cannot help referring to it as a "policy," or to the benefits as "coverage," or that the coverage in the American Dental Association policy should be "insurance of precisely the same type in the same kind of insurer" to determine admissibility of evidence in this case.

What Blue Cross does not look like is a "health service corporation," the kind of corporation relied on by the majority to take Blue Cross out of the operation of the insurance code. Blue Cross offers no medical or health service of any kind, even to the issuance of aspirin.

What Blue Cross does offer are benefits or indemnity for medical, dental or drug bills incurred, on services dispensed by medical providers, in return for premiums assumably based on the actuarial likelihood that such bills will be incurred. It is nothing if it is not an "insurer." California

-22-

Physicians' Service v. Garrison (1946), 28 Cal.2d 790, 172 P.2d 4. See People v. CMA et al (1967), 61 Cal.Rptr. 852.

Blue Cross is statutorily an insurer, writing insurance contracts. "Insurance" is a contract whereby one undertakes to indemnify another or pay or provide a specified or determinable amount or benefit upon determinable contingencies. Section 33-1-201(5), MCA. "Insurer" includes every person engaged as indemnitor, surety, or contractor in the business of entering into contracts of insurance. Section 33-1-201(6), MCA.

Blue Cross is writing "insurance" contracts, by statutory definition. It is an "insurer" by statutory definition. If in earlier years the legislature interpreted Blue Cross as something other than an insurer, it corrected that error in 1975 when it brought Blue Cross and all other "health service organizations" under the aegis of the commissioner of insurance. Chapter 30, Title 33, MCA. Under Chapter 30 of the insurance code, Blue Cross is now amenable, as it always has been, to all the provisions of the insurance code, except where the provisions of Chapter 30 are incompatible with the remainder of Title 33, MCA. (Section 33-30-102, MCA.) The majority has been led merely upon suggestion, as Hamlet led Polonius, to see a "camel" or a "whale" in what is really an insurer.

Likewise, the majority sees something other than an insurer in dismissing as dicta the effect of our decision in Fassio v. Montana Physician's Service (1976), 170 Mont. 320, 553 P.2d 998. That case involved an insurance contract issued by Montana Physicians Service, another "health service organization." The Fassio case turns upon the application to that case of statutory requirements found in the insurance code. Section 40-4102(2), R.C.M. 1947 (now section 33-22-502(2), MCA) provided for delivery to the employee covered

in the group contract a summary statement of the "essential features of the insurance coverage . . ." The turning point of our decision in Fassio was that there must be notice of the coverage provided so as to allow the insured to procure excluded coverage elsewhere. 553 P.2d at 1001, 1002. The case this Court relied on in deciding Fassio was Hayes v. Equitable Life Assur. Soc. (1941), 235 Mo.App. 1261, 150 S.W. 2d 1113, an insurance case. 553 P.2d at 1002.

In this case, the majority dismisses the clear application of insurance law to a health service organization contract in Fassio as "dicta." Why? Because "briefs in that case made no reference whatsoever to the insurance code." Briefs, and not the language in the published opinions of this Court, are now deciding what is "dicta" for the majority here.

Justice Morrison, in his accompanying dissent, has set forth in full instruction no. 17. That instruction is based on section 40-4102(2), R.C.M. 1947 (now section 33-22-502(2), MCA). It was properly given by the court.

It is clear that the majority has nullified the application of section 40-4102(2), R.C.M. 1947 (now section 33-22-502(2), MCA) to Blue Cross in direct opposition to our holding in Fassio, where we said that section 40-4102(2), R.C.M. was controlling. The trial court in this case, reading Fassio had no choice but to give instruction no. 17. It was the decided law. No district judge could have the prescience necessary to see this same court make "dicta" out of the controlling statute and the decided case. So much for stare decisis.

The people of Montana can now be well advised, if the flat statement of the majority is taken at face value, that there is no law in Montana to protect them from the vagaries

of Blue Cross when it decides their coverage.

The repudiation by the majority of Fassio, though not directly stated, is legally traumatic, but even that is overpassed by the majority's broadaxe treatment of the long-cherished collateral source rule.

There can be no logic in applying a rule for the measure of damages as authority for the admissibility of the receipt by Webers of benefits from another insurance policy. If Blue Cross were trying to demonstrate that the same coverage claimed by Webers could have been obtained elsewhere for a different premium, then perhaps under the majority's citation of Appleman, the evidence of the cost of such claimed coverage would be admissible to establish a measure of damages. Blue Cross was not trying to establish a measure of damages in offering the evidence that Webers had received $13,000 from another insurer. Its effort was to reduce Webers' claimed damages by showing Webers had received moneys from a collateral source. Until now, this Court has never allowed that.

The only real issue in this case is whether the jury acted excessively in granting the amount of punitive damages we find here. The majority has sidestepped that issue, but the result is some very bad law.

_____John C. Shulty_____
                   Justice

-25-

Mr. Justice Daniel J. Shea specially concurring:

I join the majority in reversing the judgment and ordering a new trial. I do not believe, however, that the opinion has adequately analyzed and treated any of the issues raised. I will, nonetheless, confine my comments to the issue of whether it was proper to instruct the jury that Blue Cross was governed by the insurance code.

Technically, one can agree with Justices Morrison and Sheehy that the coverage provided by Blue Cross is more in the nature of indemnity and therefore that it is insurance. The question is, however, whether Blue Cross, at the time of the transaction involved in this case--1972--believed in good faith that it was not an insurance company in the sense that it would be subject to the insurance code.

Up to the time this lawsuit was presented to the jury, no one involved with insurance believed that Blue Cross was subject to the insurance code. At the time of the claimed insurance code violations (1972), health insurance corporations were regulated by the attorney general rather than the insurance commissioner. Section 15-2304, R.C.M. 1947 (set out in full in the majority opinion). And in 1971 the legislature killed House Bill 253 which would have made health service corporations subject to the insurance code. The same legislature passed a resolution which, although not having the force of law, clearly enunciated a legislative position that it too did not consider health service providers to be under the insurance code, and that it did not want them to be under the insurance code. Until the trial court ruled in 1981 that Blue Cross was covered by the insurance code, and so instructed the jury, state officials and the companies involved, believed that Blue Cross and similar companies were not subject to the insurance code. The attorney

general assumed, the insurance commissioner assumed, and Blue Cross assumed, that Blue Cross was not subject to the insurance code.

In dealing with the Webers, Blue Cross did not comply in many respects, with the insurance code. But it is fair to say that it did not comply with the code because it believed the code did not apply. No state official had ever told Blue Cross that it was an insurance company rather than a health service provider, and therefore subject to the insurance code. But in permitting the jury to apply the insurance code to Blue Cross, the plaintiffs were given an unfair advantage.

Instructions nos. 17 and 19 were extremely prejudicial to Blue Cross. By instruction no. 17, the jury was told that if Blue Cross had not furnished "a statement in a form of the essential features of the insurance coverage of such employee or member . . ." that "no essential feature of insurance coverage not contained in a written statement. . . may be enforced against" the plaintiffs. The effect of this instruction is to state that if Blue Cross had not provided this summary form to the plaintiffs, Blue Cross could not rely on any of the exclusions or exceptions from coverage contained in the policy. Because Blue Cross had not given this statement to the plaintiffs, Blue Cross was essentially defenseless in contending that its policy provisions excluded or excepted from coverage, those claims made by the plaintiffs.

Instruction no. 19 was even more prejudicial. By this instruction, Blue Cross had a duty to obtain a written instrument signed by the plaintiffs, to the effect that any statements made by the plaintiffs could avoid insurance coverage or reduce benefits. If this written statement was not obtained, and it was not, Blue Cross could not in the absence of fraud, avoid coverage or reduce the benefits. Blue Cross did not obtain this written, signed

statement from the plaintiffs because Blue Cross did not believe it was subject to the insurance code.

Plaintiffs' counsel relied heavily on these instructions in arguing the case to the jury. Not only did they argue that Blue Cross violated the insurance code, but also they were able to argue that coverage under the policy could not be avoided or reduced because Blue Cross had not complied with the insurance code in furnishing to plaintiffs a "summary form of the essential features of the insurance coverage" (instruction no. 17) and had not obtained a written, signed statement from the plaintiffs acknowledging that any statements made for the purpose of obtaining insurance could result in avoidance of coverage or a reduction in coverage.

Plaintiffs, then, had an immense advantage in explaining their many failures to give the correct information to the Blue Cross representative. On the other hand, Blue Cross could argue only that the plaintiffs had made fraudulent representations in the applications for insurance. That is the only way (because of instruction no. 19) that Blue Cross could avoid coverage or reduce the coverage.

I would grant a new trial because instructions nos. 17 and 19 bringing Blue Cross under the insurance code, should never have been given, and they were manifestly prejudicial.

Daniel J. Shea
Justice

-28-