MR JUSTICE HARRISON
delivered the opinion of the Court.
Richard and June Weber, plaintiffs and respondents, filed this action in the Seventeenth Judicial District, in and for Valley County, on February 7,1974, seeking damages for contract benefits and wrongful cancellation by Blue Cross on their medical plan contract. On September 19, 1977, the case was transferred to the Eighth Judicial District in Cascade County. On February 9,1979, Webers moved to add punitive damages for fraud, intentional infliction of emotional distress, and bad faith to their original complaint. Shortly before trial Webers also sought to add an additional claim alleging violation of the Montana Insurance Code. The case was tried June 23 through 27,1980, and the district judge allowed the case to go to the jury on all issues of liability. The jury returned a verdict in favor of plaintiffs for every dollar in compensatory damages sought, $157,137, and for all but one dollar of the punitive damages, $999,999. Blue Cross filed motions for judgment notwithstanding the verdict, and to amend or alter the judgment, all of which were denied. Blue Cross now appeals.
Richard and June Weber, plaintiffs-respondents, have nine children and live in Glasgow, Montana, where Richard Weber has a successful dental practice. Blue Cross of Montana, defendant- appellant, is a private, nonprofit health service corporation marketing health care plans throughout Montana.
In March 1972 Dr. Weber received an informational brochure describing the “Montana Dental Plan”, a new group policy for Montana dentists. Dr. and Mrs. Weber reviewed the plan, determined that it was less expensive than their current health insurance, and decided to apply for membership. Although every dentist in Montana could apply, only medically-qualified applicants were accepted.
On April 12, 1972, Jim Burke, a Blue Cross sales representative, met with Dr. Weber at his dental office to complete the *457 membership application. Burke asked Weber questions and filled out the application form as Weber answered the questions. Dr. Weber checked the application for. accuracy, and then both Weber and Burke signed the application.
The application, which Dr. Weber read once before signing, noted that “there will be a waiting period of 12 months for all pre-existing conditions” and that “misrepresentations in this application will render the contract void”. However, Dr. Weber was not given a copy of the application or the contract and was not advised that the application was part of the contract.
Dr. Weber specifically asked Burke if Blue Cross could cancel any member’s policy without canceling the whole group plan, and Burke assured him that it was noncancelable. The contract, however, allowed Blue Cross to cancel upon thirty days’ notice.
The “completed” application was then sent to Blue Cross for processing. Although the application requested the name of the family doctor, and the date, hospital, and physicians that had treated any medical problem, this information was not provided. Blue Cross nonetheless accepted the application and issued the Webers a membership card and a copy of the application on May 1, 1972. It is not clear whether a copy of the contract was first sent to Webers on May 1, 1972, or in 1973 when their attorney requested one. In any event, Webers canceled their old insurance shortly after May 1,1972.
On May 25, 1972, and in October 1972, June Weber was hospitalized in Glasgow for what was initially diagnosed as a bleeding ulcer. On both occasions the bills were sent to Blue Cross but were not paid.
In November 1972 June Weber went to Billings for extensive testing by Dr. Hurley, an internist. Dr. Hurley diagnosed varices of the esophagus (vericose veins in the esophagus) and a polyp in her duodenum (growth in the small intestine). This bill was also sent to Blue Cross but was not paid.
In April 1973 June Weber had another bleed, and an airplane was chartered to fly her to Billings for treatment. She had surgery for the esophageal varices. Again the bill was submitted to Blue Cross and was not paid.
*458 Webers first became aware that bills were not being paid in August 1972 when Dr. Weber got a second bill for the May 1972 hospitalization. Dr. Weber contacted the local Blue Cross agent and was told that Blue Cross did not receive a bill. (In fact, Blue Cross had received the bill on June 22, 1972.) Dr. Weber asked the hospital to send Blue Cross another bill, but it too was not paid.
In March 1973 Dr. Weber wrote the Montana Dental Association, the Montana legislature and Blue Cross to complain about the trouble he was having with Blue Cross. In response to this letter, Blue Cross claims manager Nehus wrote on March 23,1973, indicating that the April 12,1972 application was reviewed, considered for cancellation, but retained. Blue Cross then denied payment on grounds of preexisting conditions.
Blue Cross had originally received the May 1972 hospital bills on June 22, 1972. On July 14, 1972, Dr. Shull, medical director for Blue Cross, reviewed the bills and requested a copy of the hospital history from the Glasgow hospital in order to determine whether the claim was pre-existing. Blue Cross received incomplete information, made several more requests for information, and completed its files on February 7, 1973, when it determined that June Weber’s medical condition was pre-existing.
On March 23, 1973, Blue Cross notified Webers that bills associated with esophageal varices would not be paid because the condition was pre-existing. Then, on June 1, 1973, Blue Cross sent the Webers a letter unilaterally declaring the contract void because Dr. Weber had misrepresented his family’s health on the application. This suit followed.
At trial there was voluminous testimony concerning whether or not June Weber’s esophageal varices were preexisting. In general, there was a great deal of evidence indicating that they were not pre-existing, and little credible evidence indicating that they were pre-existing. The point became moot, however, when Jury Instruction No. 12 was given, which indicated that a medical condition should not be considered pre-existing unless it manifests itself prior to the effective date of insurance. All the evidence Blue Cross *459 presented indicated that the condition may have existed, but the condition was unknown prior to May 1, 1972. Therefore, Blue Cross admitted during closing argument that, based on the jury instructions, there were no pre-existing conditions.
However, there continues to be a great deal of disagreement as to whether Dr. Weber misrepresented the health of his family when completing the application for membership in the Montana Dentists’ Group Plan.
Dr. Weber did reveal that June Weber had a minor kidney infection twelve years earlier, that June Weber had her spleen and gallstones removed three years earlier, and that seven of his nine children wore glasses.
Medical conditions that Dr. Weber did not reveal include:
1. June Weber’s familial (inheritable) anemia;
2. Dr. Weber’s heart condition for which he occasionally took medication; and that Dr. Weber also suspected his son had a heart problem;
3. June Weber’s continuing bladder trouble;
4. Removal of June Weber’s ovary;
5. Five or six visits that June Weber had made to the local mental health center in the past year;
6. An ear infection and subsequent dizziness experienced by June Weber;
7. June Weber’s chronic diarrhea;
8. Dr. Weber’s hiatal hernia;
9. Son’s dislocated shoulder.
10. Daughter’s borken arm; and
11. Daughter’s pneumonia.
In each case Blue Cross presented testimony indicating that these conditions constituted a “departure from good health” and, therefore, it was a material misrepresentation to not disclose this information on the application.
Webers presented testimony that these conditions, as they affected the Webers, were not a departure from good health and that there was no reason to mention them on the application. Dr. Weber further testified that he considered it a personal judgment call and that in his personal opinion it was not necessary to list that information. In any event, Dr. Weber *460 testified he told Burke about June Weber’s hysterectomy and anemia and that Burke did not consider it important enough to record on the application.
Evidence was also presented at trial concerning past medical expenses, future medical expenses and emotional distress. Benefits the Webers would have received between May 1, 1972, and June 27, 1980, minus premiums, total $24,250. Currently, June Weber goes to Chicago once a year to treat her esophageal varices, which costs $3,500 a trip. Thus, future medical expenses are estimated at $47,887. Finally, the jury awarded $55,000 to June Weber and $30,000 to Richard Weber for emotional distress. Thus, the total for compensatory damages ($24,250+$47,887+$85,000=$157,137) is $157,137.
Evidence was offered, and rejected, showing that Dr. Weber made similar “misrepresentations” on an application for Blue Shield membership following cancellation of the Blue Cross membership. Blue Cross also offered, and had rejected, evidence showing that Webers collected $13,000 from an American Dental Association plan obtained after the Blue Cross cancellation.
Six issues are raised on appeal:
1. Are health service corporations subject to the Montana Insurance Code?
2. Did the trial court properly deny the defense motion for directed verdict on the issues of actual and constructive fraud?
3. Did the trial court properly deny the defense motion for directed verdict on the tort of bad faith?
4. Did the trial court properly exclude evidence of insurance received subsequently to the Blue Cross policy?
5. Did the'trial court properly refuse to allow Dr. Weber to be impeached with his subsequent Blue Shield application?
6. Was there sufficient evidence to support an award of $157,137 in compensatory damages and $999,999 in punitive damages?

I. INSURANCE CODE

Are health service corporations subject to the Montana Insurance Code? We hold they are not.
*461 It is evident that the legislature did not intend health service corporations to be bound by the insurance code. First, in 1972, health service corporations were regulated by the attorney general, rather than the insurance commissioner. Section 15-2304, R.C.M. 1947, provided:
“All health service corporations organized hereunder shall be subject to supervision by the particular professional board or hospital board or agency under which members or hospitals are licensed and they shall at all times be subject to examination by the attorney general on behalf of the state, to ascertain the condition of affairs of any such corporation, and to what extent, if at all, any such corporation may fail to comply with trusts which it has assumed or may depart from the general purposes for which it is formed, and in case of any such failure or departure the attorney general shall institute, in the name of the state, the proceedings necessary to correct the same; all such medical, hospital or health service corporations heretofore organized and existing under the nonprofit corporation laws of Montana shall be subject to the provisions hereof. . .”
Second, health service corporations were specifically exempt from the insurance code by section 40-2611, R.C.M. 1947, which stated: “This code shall not apply to health service corporations, to the extent that the existence and operations of such corporations are authorized by section 15-1401 [now section 15-2301] and related sections of the Revised Code of Montana, 1947.”
Third, the 1971 Legislature passed House Resolution 20 which recognized the unique status of health service corporations. HR 20, 1971, provides in part:
“WHEREAS, as of now, health service corporations are not under the jurisdiction of the insurance commissioner, and “WHEREAS, the said corporations are not amenable to the insurance code, title 40, RCM 1947 . . .”
Fourth, the 1971 Legislature killed House Bill 253 which would have made health service corporations subject to the insurance code. We therefore conclude that the legislature, prior to 1972, did not intend health service corporations to be subject to the insurance code.
*462 Further, Blue Cross was surprised by the late addition of the insurance code claim. Webers stated in their brief in support of the motion for leave to amend the complaint that, “plaintiffs are not alleging that a violation of the [insurance] code occurred.” Yet, the pretrial order dated June 23, 1981, the day trial began, contained allegations of insurance code violations. Blue Cross was understandably surprised and prejudiced by this addition in violation of Rule 60(bXl), M.R.Civ.P.
Appellant cites Harsh v. Blue Cross of Montana (1973), 162 Mont. 546, 514 P.2d 767, an order denying a supervisory writ, as supporting the proposition that health service corporations are not subject to the insurance code. However, section I, part 5, of the Montana Supreme Court Internal Operating Rules, provides that “Orders . . . shall not be . . . cited as authority in any subsequent proceeding.” Thus, the Harsh decision is irrelevant.
Respondents cite Fassio v. Montana Physicians’ Service (1976), 170 Mont. 320, 553 P.2d 998, as supporting the proposition that health service corporations are subject to the insurance code. However, briefs in that case made no reference whatsoever to the insurance code. Thus, the insurance code was not at issue, and any reference to the insurance code in the Fassio decision is purely dicta.
We conclude that health service corporations are not subject to the Montana Insurance Code and that Jury Instruction Nos. 17 and 19, binding Blue Cross of Montana to the insurance code, were erroneous.

II. DIRECTED VERDICT ON ACTUAL AND CONSTRUCTIVE FRAUD

Did the trial court properly deny the defense motion for a directed verdict on the issues of actual and constructive fraud? We hold the directed verdict was properly denied.
When deciding a motion for directed verdict, the trial judge must view the evidence in a light most favorable to the plaintiff. Ferguson v. Town Pump Inc. (1978), 177 Mont. 122, 580 P.2d 915. No case should be withdrawn from the jury if reasonable men may differ as to the conclusions drawn from *463 the evidence. Solich v. Hale (1967), 150 Mont. 358, 435 P.2d 883.
Representations designed to induce one to execute a contract must be made in good faith. State ex rel. Dimler v. Dist. Ct., Eleventh J.D., Etc. (1976), 170 Mont. 77, 550 P.2d 917, 921. If the representations are false, a cause of action would lie under (1) the “breach of obligation” theory of section 17-208, R.C.M. 1947, or (2) actual or constructive fraud theory, sections 13-307 to 13-309, R.C.M. 1947. See, Dimler, 550 P.2d at 921.
The evidence, viewed in a light most favorable to the respondents, indicates reasonable men could differ as to the conclusions drawn from the evidence. Burke allegedly represented the Blue Cross policy as noncancelable, yet it was canceled. Blue Cross brochures promised “comprehensive health care”, yet claims were denied because of pre-existing conditions that Blue Cross could not prove. Other examples exist, but the point remains the same: reasonable men could differ as to the conclusions drawn from the evidence. Therefore, the directed verdict was properly denied.

III. DIRECTED VERDICT ON BAD FAITH

Did the trial court properly deny the defense motion for directed verdict on the tort of bad faith? We hold the directed verdict was properly denied.
This Court noted in Dimler, supra, that when one party makes representations which induce a second party to enter into a contract, the first party’s “representations necessarily contain an obligation to act in good faith”. 550 P.2d at 921. If the contract is subsequently breached, “[a] cause of action may sound in tort although it arises out of a breach of contract, if a defaulting party, by breaching the contract, also breaches a duty which he owes to the other party independently of the contract.” First § Bank of Bozeman v. Goddard (1979), 181 Mont. 407, 59 3 P.2d 1040, 1047, 36 St.Rep. 854. Goddard, unlike the instant case, involves an insurance contract, but the legal principles are the same. Blue Cross has an obligation to act in good faith with its members. This is *464 especially true because Blue Cross is in a much better bargaining position than those applying for membership in its program. Usually the applicant has no voice in the preparation of the contract. Further, when a claim is filed, often the member “may be in dire financial straits and therefore may be especially vulnerable to oppressive tactics by [a health service corporation] seeking a settlement or release.” Goddard, 593 P.2d at 1047.
In the instant case, the evidence viewed in a light most favorable to the respondents indicates that Blue Cross did not give Webers a written copy of their contract rights until the Webers hired an attorney. Further, Blue Cross, arguably, unreasonably denied the Webers’ claims. Thus, reasonable men can differ as to the conclusions reached by the evidence, and the directed verdict was properly denied.

IV. OTHER INSURANCE CLAIMS

Did the trial court properly exclude evidence of insurance received subsequently to the Blue Cross policy? There is insufficient evidence in the record for this Court to decide this question, and we remand.
Blue Cross attempted to introduce evidence showing that $13,000 of Webers’ medical bills were paid by an American Dental Association insurance policy received subsequent to the Webers’ Blue Cross policy. Such evidence would affect not only compensatory damages for medical expenses, but also the claims for emotional distress and psychological pain caused by the mounting medical bills.
Is the new insurance relevant to the question of damages? Appleman’s Insurance„ Law and Practice gives some guidance:
“The measure of damages for a wrongful breach of insurance contracts must be determined on the facts of each case . . .

it

“If the insured can secure insurance of a like character and value to that cancelled, the difference between the cost of carrying the cancelled insurance for the term stipulated and the *465 cost of new insurance for a like term would be his measure of damages. It should, however, be insurance of precisely the same type in the same kind of insurer, since the cost of carrying insurance in a fraternal association would not be the same as that of an old line company.” 20 Appleman, Insurance Law and Practice, section 11255. (Emphasis added.)
There is insufficient evidence in the record to determine whether the new insurance is similar to the canceled Blue Cross policy. Therefore, we remand this issue to the trial court for consideration in light of this opinion.
7. SUBSEQUENT INSURANCE APPLICATION
Did the trial court properly refuse to allow Dr. Weber to be impeached with his subsequent Blue Shield application? We hold the impeachment was properly denied.
Immediately after Webers’ Blue Cross policy was canceled, they applied for similar coverage from Blue Shield. On the Blue Shield application, Dr. Weber denied that anyone in the family had ever had anemia and stated that his wife’s problem with varices (for which she is still being treated today) was corrected. At trial, Blue Cross tried to introduce the Blue Shield application to impeach Dr. Weber with a prior inconsistent statement, and to show Dr. Weber’s state of mind when completing the Blue Cross application. Rule 801(dXl), Mont.R.Evid.
Information contained in a subsequent application for insurance is not admissible. Continental Insurance Co. v. Clayton Hardtop Skiff (3rd Cir. 1966), 367 F.2d 230; Nicoll v. American Ins. Co. (1847), 3 Woodb & M 529, F. Cas. No. 10259.
Further, there is no convincing evidence that the Blue Shield application is inconsistent with the Blue Cross application. Dr. Weber testified that he told the Blue Cross agent, Burke, about his wife’s anemia, and Burke chose not to put it on the application. There is also evidence that Dr. Weber gave the Blue Shield agent information which the Blue Shield agent chose not to write down. If the applications are not accurate, and not inconsistent, they cannot be used as evidence of a prior inconsistent statement. Rule 801(dXl), Mont.R.Evid. *466 The Blue Shield application was properly excluded from evidence.

VI. DAMAGES

Was there sufficient evidence to support an award of $157,137 in compensatory damages and $999,999 in punitive damages? The errors noted above invalidate the judgment. Therefore, we need not address this issue.
However, it should be noted that the trial court admitted evidence concerning the purchase and sale by Blue Cross of the Rainbow Hotel in Great Falls, Montana. This was completely irrelevant, very prejudicial and likely to affect the jury’s award of damages. See, Rule 402, Mont.R.Evid. The evidence should not have been admitted.
In summary, we hold that (1) Blue Cross is not subject to the Montana Insurance Code; (2) directed verdicts were properly denied on the issues of fraud and bad faith; and (3) evidence of Dr. Weber’s subsequent application for Blue Shield coverage is inadmissible to prove intent. The trial court, with the benefit of additional evidence, shall rule on the admission of evidence concerning the $13,000 that the Webers collected from an American Dental Association health insurance policy. We do not reach the issue of damages.
We reverse in part, affirm in part and remand for a new trial consistent with this opinion.
JUSTICES DALY and WEBER concur.