Burke, J.
These are three test actions brought to recover benefits claimed to be payable under the provisions of contracts issued by the respondent, a nonprofit medical indemnity corporation, for physicians’ services rendered to United Medical Service subscribers (Messrs. Tobias and Schmier and Miss Sinnette) in wards of a New York City Municipal Hospital.
Each appellant asserts that he rendered medical care to the patient subscribers involved herein and out of this treatment *206 there arose the ’ respondent’s obligation under its service contracts to reimburse him for his care.
The respondent’s principal contention in defense of these claims is that it is only obligated to pay benefits where a subscriber has incurred liability to his doctor for a professional fee. If the patient need not pay the practitioner for the care that he receives, the respondent asserts that it need not pay.
The Appellate Division unanimously affirmed- judgments of the Supreme Court, New York County, dismissing the complaints after a single nonjury trial of three cases. The three actions were tried together by order of the trial court on stipulation of the parties; The trial court made 134 findings of fact and 18 conclusions of law which the Appellate Division affirmed. We perceive no evidence sufficient to warrant a different determination.
The appellants are licensed-physicians on the visiting staff of the Bronx Municipal Hospital Center, a large medical center and hospital owned and operated by the City of New York. Pursuant to an agreement between the city and Yeshiva University, the Bronx Municipal Hospital Center visiting staff is drawn entirely from the faculty of the university’s Albert Einstein College of Medicine and this.faculty is responsible for the professional care of all of the patients in the hospital center. Physicians are full-time professors of the college faculty. They receive a salary from the university for all services performed on its behalf.
The Bronx Municipal Hospital Center is used by the faculty of the medical school for teaching purposes. Students from the medical school are assigned to the wards of the hospital center as “clinical clerks ”. The "students are provided with alcoves on the wards equipped with 10 to 12 desks for study purposes. The students accompany the appellants and other professors from the medical school as they make their rounds on.the wards. It is the teaching policy at the hospital center,to have the interns and residents perform as many of the services rendered to a patient as possible. The visiting physicians and surgeons from the faculty of the medical school act in a supervisory and teaching capacity.
A patient is admitted to the hospital center either through the emergency room or one of the - out-patient clinics, after being *207 examined there by an intern or resident. If emergency treatment is in order it is administered by the intern or resident. The intern or resident admits the patient to the hospital and assigns the patient to one of the wards in accordance with a system of rotating new admissions among the wards so that no ward receives more than its fair share of new patients. There are 40 beds on a ward. A resident and two interns are assigned to each ward virtually full time. Upon the arrival of a patient on the ward, responsibility for the care of the patient is assigned to one of the interns. “ Definitive treatment ”, when called for, is given by the intern. The intern is supervised by the resident assigned to the ward. The resident and interns on the ward are in turn supervised by a chief resident. The chief residents are physicians with three previous years of clinical experience. Visiting physicians from the faculty of the medical school are assigned to tours of duty on a particular medical ward, usually a month at a time, in accordance with a schedule prepared annually by the head of the department of medicine of the medical school. Similarly, visiting surgeons from the faculty are. regularly assigned to the hospital center’s surgical service.
The visiting physicians make regular rounds on their assigned wards accompanied by groups of interns, residents, medical students, nurses, social workers, etc. Since there are 40 beds the visiting physician obviously cannot divide his time among the patients on the ward. At the end of a visiting physician’s assignment to a ward, which usually lasts a month, a new visiting physician is assigned to make rounds on the ward. The visiting physicians and surgeons are, in turn, supervised by the directors of the particular departments or services of the hospital in which they are serving. The director of a particular department or service at the hospital center is also the head of that department at the medical school. These directors are also visiting physicians. These directors are, in turn, subject to the supervision of the medical superintendent of the hospital center and the medical board of the hospital center. The medical superintendent and medical board are, of course, subject to the supervision of the Commissioner of Hospitals. The head of the service becomes the attending physician in effect on the entry of a patient.
*208 At the Bronx Municipal Hospital Center the patient has no choice of physicians. The fact that a particular patient comes in contact with any particular physician or surgeon is entirely the result of which ward the patient is assigned to and which physicians or surgeons happen to be assigned to that ward.
The trial court found that the following statement of fact and policy, which the medical board of the Bronx Municipal Hospital Center submitted to the Internal Revenue Service, reflects the situation at the hospital center:
“ It is the customary procedure that a.patient may be treated by several physicians who are on service at that time, and during the patient’s course of hospitalization may then be treated by another group of physicians whose time it has come to rotate their services on the particular medical or surgical specialty. Thus, it becomes almost an impossibility for one physician to be entitled to any of the monies, and hence it becomes a matter of administrative expediency to bill in the name of either the Director of the Service or his designated representative or representatives. * * *
“ There is absolutely no personal relationship of physician and patient since the patient does not voluntarily have the choice of the physician, and in most cases, does not know nor has he ever heard of the physician, but simply becomes a patient of the particular physician by reason of chance.”
The ruling of the Commissioner of Internal Revenue reads in part as follows:
“ On the basis of your statement that ‘ by virtue of resolution of the Medical Board herein annexed, none of the funds received for such services rendered by a member of the Medical Staff may be retained by any physician or surgeon for his own use or benefit, ’ it is assumed that every member of the Medical Staff who is entitled to charge for services rendered to patients at the Hospital Centre is required to comply with the terms of the resolution as a condition of his membership.
“ Under these circumstances, it is our opinion that members of the Medical Staff supply professional care to the patients at the Hospital Centre as agents of the Hospital Centre. Accordingly, it is held that the amounts paid for such services and deposited to the account of the Medical Board Fund shall not *209 be included in the gross income of the various members of the Medical Staff who perform the services.”
Appellants have not reported such moneys as income in their Federal and State income tax returns. Thus, appellants did not treat these moneys as having belonged to them at any time, nor did they take any charitable deduction in their tax returns with respect to these moneys.
The medical board of the Bronx Municipal Hospital Center is an official body, and, subject to the supervisory jurisdiction of the Commissioner of Hospitals, it is the governing body of the hospital center.
Acting through its medical board, the hospital center established the fund as the “Medical Board Fund of the Bronx Municipal Hospital Center ’ \
The medical board fund is not a separate legal entity. It is controlled and administered by the medical board.
When dealing with insurers other than United Medical Service it was the practice for medical board personnel to bill for the services of all visiting physicians on a billhead entitled “Medical Board Fund Bronx Municipal Hospital Center”.
Respondent, United Medical Service, is a nonprofit medical indemnity corporation and is authorized under section 250 of the Insurance Law to furnish ‘1 medical expense indemnity ’ ’ insurance as “ reimbursement for medical care provided through duly licensed physicians ”. The respondent has “ service contracts ” with subscribers in the New York metropolitan area. These contracts provide, among other things, for surgical and in-hospital medical care rendered by duly licensed practitioners. The contracts involved in these actions so provided and, with the exception of the amount of the benefits, these contracts were in all relevant respects identical.
Since the United Medical Service contracts provide benefits only tohere a subscriber has incurred liability to a physician for a professional fee, the major issue at the trial was whether the three subscribers did incur any liability to appellants for such a fee. The cause of action cannot be built on an express contract with the subscribers. The question is whether a cause of action on an implied contract exists at common law. Appellants also claim to come within a .statutory exception to the prohibí *210 tion against visiting physicians ’ accepting compensation for. services in wards of city hospitals. That exception provides that visiting physicians “ shall be authorized to charge ” fees with respect to “ patients who carry sickness or accident insurance which covers physicians’ fees ” (New York City Charter, § 585, subd. c). Appellant Sands on asserts in addition a right to recover based on an assignment from Mr. Tobias. There is a contract provision which reads “ The rights of a Subscriber under this Contract are personal to the Subscriber and are not assignable.”
The trial court specifically found that there was no implied contract and that “ The medical expense indemnity issued by defendant is not ‘ sickness or accident insurance ’ ”. It also found the assignment to Sandson void.
Considering the issue of implied contract first as it may be decisive, it is clear that, if the question of implied contract is only a question of fact, the findings of the trial court, affirmed by the Appellate Division if supported by sufficient evidence, would be conclusive of these appeals on that point (Aerated Prods. Co. v. Godfrey, 290 N. Y. 92, 99).
We have held that the existence of an implied contract is a question of fact (Grombach Prods. v. Waring, 293 N. Y. 609, 613, 615; Miller v. Schloss, 218 N. Y. 400, 406). In connection with an implied contract to pay for personal services, the plaintiff usually must prove that the services were performed and accepted with the understanding on both sides that there was a fee obligation. (Fox v. Arctic Placer Min. & Milling Co., 229 N. Y. 124, 131; Mitchell v. Rouse, 19 App. Div. 561; Anderson v. Distler, 173 Misc. 261.) Appellants, therefore, had to show, unless' there is a presumption of liability arising from the mere rendition of services, that the subscribers in some way engaged appellants, rather than the Bronx Municipal Hospital Center, to cure them. Appellants also had to show that appellants accepted the subscribers as their patients, and that, under the circumstances, it was mutually understood, at the time services were rendered, that appellants would be personally compensated by the subscriber (Miller v. Schloss, 218 N. Y. 400, 406-407, supra; McGuire v. Hughes, 207 N. Y. 516; Anderson v. Distler, 173 Misc. 261, supra).
*211 Even if we disregard the representations made to the Internal Revenue Bureau, there is a complete failure of such proof. Apart from the ultimate finding that there was no implied contract, the trial court made subsidiary findings which led to the ultimate finding. These findings are in the formal findings of fact. Thus it is found that none of the subscribers were private patients of the appellants; that the subscribers came in contact with appellants purely as the fortuitous result of the hospital center’s system of assigning patients and physicians to the respective wards, that there was no evidence that any of the subscribers, or Miss Sinnette’s parents, ever requested any of the appellants to give them medical or surgical care or treatment; during the period that the subscribers were in the hospital center none of the appellants expected that they would be compensated with respect to any of the services received by the subscribers during their hospitalization; none of the appellants rendered services to the subscribers in the recognized personal relationship of physician and patient.
The evidence to support these findings is substantial. In the case of Mr. Schmier, a Dr. London was the physician chiefly responsible for his care. But it was to an intern, Dr. Stasa, that the care of Mr. Schmier was specifically assigned, and it was he, and the full-time resident, Dr. Kahn, who gave Mr. Schmier his ‘ ‘ definitive treatment ’ ’. Appellant Scheinberg, as well as Dr. London, made rounds on the ward during part of Mr. Schmier’s hospitalization. But after appellant Scheinberg left the ward appellant Sandson took over this function. Finally, it was some unidentified intern who decided that Mr. Schmier should be discharged from the hospital center.
In the case of Mr. Tobias, Dr. London was again chiefly responsible. But again it was to an intern, Dr. Friedland, that Mr. Tobias’ care was specifically assigned. In addition to Dr. London, appellant Sandson also made rounds on the ward, that is, until he was replaced by Dr. Gordon in the middle of Mr. Tobias’ hospitalization.
In the case of Miss Sinnette, Dr. State was chiefly responsible. Miss Sinnette was brought to the center by her father, Dr. Calvin Sinnette, who was himself a member of the staff of the hospital center. He brought his daughter to the out-patient clinic. *212 She was entrusted to the care of a pediatrician, whose name does not appear on the record, who gave her a complete examination. She then came in contact with appellant Shapira solely because on the day in question he was responsible to see to it that surgery required in the pediatric wards was performed: Appellant Shapira did not tell Dr. Sinnette that he would perform the operation, and he did not commit himself to do so. Furthermore, as appellant Shapira testified concerning his duties on the day in question, “I am serving in the capacity of a director of that pediatric surgical service, and I may choose to have someone else operate on the patient for specific reasons, depending on the nature of the condition.” Thus, it was appellant Shapira who, in accordance with the hospital center’s regulations, chose Miss Sinnette’s resident surgeon. It was not Miss Sinnette or her parents who made the choice of the resident surgeon. At no time v?as Dr. Shapira under any obligation to perform the operation himself. The surgery consisted of two surgical procedures: the removal of a cyst and the removal of the appendix. Dr. Shapira, assisted by íavo residents, removed a cyst. One of the residents performed the appendectomy. Thereafter Dr. Shapira left the room while one of the residents closed the incision, a procedure which took about half an hour. This procedure was in accord with present-day practice. This is particularly true of city hospitals, such as the Bronx Municipal Hospital Center, which have been held entitled to practice medicine and to bill for medical and surgical services (Matter of Kocko v. Harris Coal Co., 262 N. Y. 535). In Allen’s Case (265 Mass. 490), the patient, having no physician of his own, went to a public hospital where he received treatment from a visiting physician. The court held (supra, p. 493): “Physicians as well as nurses are generally expected to be in attendance at a public hospital. A patient who has been taken to such an institution if he has no physician of his OAvn to treat bim naturally expects that he will receive treatment from someone on the staff. When an injured employee under the compensation act goes to such a hospital and does not select a physician, the payment to the hospital of its charges includes the expenses of nurses and physicians, and the insurer is not required to pay the physician Avho is a member of the staff for his services.”
*213 Here the subscribers expected the hospital center to attempt to cure them, and the hospital center undertook to do so. The hospital center, through its residents and interns, decided that Messrs. Schmier and Tobias, and Miss Sinnette should be admitted to the hospital center. The hospital center decided to what wards the patients should be admitted, and it was that decision which determined the physicians with whom the subscribers would come in contact. The hospital center assigned many physicians to the ward services to which the subscribers were also assigned.
Freedom to choose one’s physician is an element which would buttress a claim of a contract on the part of the patient to pay the physician a fee (Beekman Downtown Hosp. v. Murphy, 203 Misc. 121; Roosevelt Hosp. v. Loewy, 185 Misc. 113). In the Beekman case (supra) the hospital recovered for medical services rendered by physicians to the defendant when he was a ward patient in the hospital. The defendant had argued that the hospital was not the real party in interest and that a payment to it would not bar an independent action by the physicians to recover for their services. In awarding judgment to the hospital, the court held, at page 123: “ Concededly the defendant was an ambulance patient treated in the ward of the plaintiff hospital; as such he ‘ has no freedom of choice or of contract or terms in respect of a physician who attends him at .such hospital. ’ (Roosevelt Hosp. v. Loewy, 185 Misc. 113, 114.) It would appear, therefore, that there is no contractual relationship, either express or implied in law, upon which any such treating surgeon could predicate a cause of action against a ward patient.”
These subscribers, however, not only lacked the choice of physicians, they never had a physician of their own. The subscribers were not private patients of the appellants. Indeed, appellants were prohibited from having private patients at the hospital center. It is evident that none of the appellants was in a position to enter into such a relationship with subscribers. The rules of the hospital center forbade it. The fact that there was no personal relationship between appellants and the subscribers furnishing a basis for a professional fee enabled Dr. Scheinberg and Dr. Sandson, without fear of malpractice liability, to abandon Mr. Schmier and Mr. Tobias by *214 leaving them in the middle of their hospitalizations. They could not have abandoned them had they been “ their patients The rule is well established that once a physician accepts a patient he must continue to serve the patient during his illness unless he gives the patient timely notice so that he may engage another doctor or unless, of course, the patient consents to his leaving the case. The subscribers had no right to have appellants as their physicians. Their engagement was with the hospital center, not with the appellants. Patients in such circumstances are not liable for the services rendered by the visiting physicians.
There is no room for the application of a presumptive liability. In Fox v. Arctic Placer Min. Milling Co. (229 N. Y. 124, 128, supra) it is expressly stated that whether any presumption is created by the rendition of services depends on “the relationship of the parties ”. As the trial court found, the question of compensation was ‘‘ afterthought ’ ’ and this hardly serves to establish a presumption. (Mitchell v. Rouse, 19 App. Div. 561, supra; Anderson v. Distler, 173 Misc. 261, 267, supra). On their own theory of charging for services, appellants could charge only if the patient had United Medical Service coverage ; and appellants did not learn that the patients here involved had United Medical Service coverage until after the patient had been released from the hospital center. Furthermore, the existence of a relationship of physician-patient for the purpose of the application of the physician-patient privilege has no bearing on the right of the physician to charge a fee. (Renihan v. Dennin, 103 N. Y. 573.) The possibility of liability for malpractice does not go toward proving a presumption because it is not a prerequisite of the physician-patient relationship. Hospitals, including city hospitals, may be liable for malpractice (Bing v. Thunig, 2 N Y 2d 656; Becker v. City of New York, 2 N Y 2d 226; DuBois v. Decker, 130 N. Y. 325, 332).
Argument is made that the subscribers did not object to appellants’ treating them and that, therefore, a presumption arose that the subscribers became obligated to pay appellants a fee for professional services. But in Edson v. Hammond, (142 App. Div. 693, 698 [1st Dept., 1911]) the court, in discussing the facts necessary to establish liability of a patient to pay for medical services rendered to him, stated: “To *215 establish this liability, three things should have occurred: (1) Defendant should have known that plaintiff was attending him professionally; (2) he should have been * * * free to object or protest; (3) he should have either expressed his assent to plaintiff’s attendance or failed to object thereto.”
In this case the subscribers did not assent and they were in no position to assent or object to the appellants’ treatment. They were not free to object. The hospital center had agreed to provide care and treatment and the appellants were assigned in accordance with the contract between the university and the center. The subscriber had no cause to protest, because they expected the hospital to provide all necessary medical services, which it did. When such a relationship exists may be defined but the law does not readily imply the relation.
In Fox v. Arctic Placer Min. & Milling Co. (229 N. Y. 124, 129, supra) the court pointed out that there was a presumption that officers and directors serve without compensation in performing the duties of their office, but that such presumption could be rebutted by proof of an agreement to pay for the services. There is no fact or set of facts in these cases which exemplifies such an association.
In Matter of Agnew (132 Misc. 466, 474), relied on by the appellants, the ease was decided on the theory of quasi contract. The court held that through mutual mistake the patient had been unjustly enriched and that ‘ in equity and good conscience ” his executors should pay the surgeons a fee (14 Cornell L. Q. 239). Of course, there was no “ mutual mistake ” in these oases. Appellants can hardly contend, as they do, that the subscribers and appellants had a 1 ‘ mutual understanding ” or that there is a presumption resulting in a contract implied in fact, and, at the same time, claim that there was some fundamental misunderstanding between them. A basic point in the Agnetv case is that the patient would have had a private physician, to whom he would have owed a “ private fee ”, if his wealth had been known. In the present cases the subscribers could not, under any circumstances, have had a private physician. The very rules of the hospital center prohibited it. Furthermore, as the court pointed out in the Agnew case (p. 472), the physician in that case could have refused to treat Mr. Agnew except as a private patient paying a private fee. In the instant cases appellants *216 could not have refused to see any one whom the hospital center had admitted to its wards. These cases were not pleaded or tried on any theory of quasi contract. On snch a theory, ‘ unjust enrichment” would have been the question of fact (Miller v. Schloss, 218 N. Y. 400, 408, supra). No issue of “ unjust enrichment ” was tendered on the trial. So it seems to us that the acts relied on here to establish an agreement, whether viewed individually or together, are not such arrangements as carry the consequences implied by the appellants.
In conclusion on this point it is only necessary to recall that the city supplies a complete medical service for the patients receiving treatment at the Bronx Municipal Hospital Center. It is assured that the services of the residents and interns will be available since it has an employment contract with each of these individuals requiring that this care be given in return for the doctors’ specified salaries. It is equally assured of a qualified visiting medical staff to oversee the operation of the medical service through its contract with Yeshiva University. This contract requires that the Albert Einstein Medical College faculty be responsible for the professional care of all of the patients at the hospital center, in return for the facilities at the center being available to the college as a teaching hospital. These visiting physicians are not paid by the city, but they receive a salary from the college for their services there. These faculty duties include their responsibilities as members of the visiting staff at the Bronx Municipal Hospital Center. The city has thus supplied the services of these visiting physicians and surgeons for the care of the patients just as surely as it has supplied the services of the residents and the interns. There is not present in these cases the usual fee-expectation aspect of the ordinary physician-patient relation. The service contract of the respondent, a nonprofit medical indemnity corporation, did not contemplate the payment of fees with this element absent from the relation. Only in a situation in which there is an obligation on the part of the patient to pay his doctor was it intended that this medical indemnity insurance apply. Whenever the visiting staff physician cannot compel payment of a bill by a patient for the medical care that he has rendered, the United Medical Service cannot be charged either.
*217 We pass to appellants’ other argument that subdivision c of section 585 of the City Charter not only permits them to accept fees but actually creates a statutory liability of United Medical Service subscribers to pay personal fees to appellants.
In the Appellate Division both the appellants and the respondent agreed that the question was whether the appellants had a contractual right at common law to recover a personal fee from the patients and agreed that subdivision c of section 585 of the City Charter does not itself create any liability on their part. (Reply brief in Shapira case in App. Div. pp. 9-10.) The rule generally stated is that this court will not pass upon questions raised for the first time on appeal where, as here, it was not only not presented to the courts below but expressly excluded. However that may be, we think the new question has no merit.
Since the courts below have properly found that the subscribers incurred no common-law liability to appellants, subdivision c of section 585 of the City Charter is relevant only if subdivision c of section 585 creates a statutory liability independent of the common law. The City Charter has not done so.
In Matter of Glazer v. Department of Hosps. (2 Misc 2d 207, 209) the court held that subdivision c of section 585 of the City Charter “ is merely permissive in nature ”. Similarly, in Reardon v. Spagna (205 Misc. 196, 197, revd. on procedural grounds 284 App. Div. 975), the court held that subdivision c of section 585 of the City Charter is ‘ merely permissive and authorizes the acceptance of medical fees by doctors who serve on the medical staff without compensation * * * and thus creates no statutory obligation.”
The words in question are contained in the phrase that members of the medical staff in city hospitals “ shall be authorized to charge medical fees for services rendered by them ” with respect to ‘ ‘ patients who carry sickness or accident insurance ’ ’. Contrast this language with the explicit provisions of that section of the City Charter which does deal with the patient’s liability for his treatment in a city hospital. That section (§ 587, subd. b) provides that the patient ‘ ‘ shall be liable for and shall pay to the extent of his ability for such care * * * and the commissioner shall collect”. That is the language that would have been used in subdivision c of section 585 had it been intended to create a statutory liability on the part of the patient. As *218 stated in Matter of Wilson Sullivan Co. (263 App. Div. 162, 164, affd. 289 N. Y. 110): “ Intention to change the common law will not be presumed from doubtful statutory provisions. It will be presumed that no change is intended unless the statute is explicit and clear.”
Finally the trial court made the following conclusion of law: " The medical expense indemnity issued by defendant is not ‘ sickness or accident insurance ’ ”. This conclusion of law is dictated by explicit provisions of the Insurance Law. Under subdivision 1 of section 164 of the Insurance Law, “ sickness or accident insurance ” is defined as synonymous with “ accident and health insurance ”. Neither subdivision 3 of section 46, subdivision 2 of section 190 nor section 164 of the Insurance Law is applicable to “Medical Expense Indemnity” corporations. The Legislature dealt with them separately. An entire article of the Insurance Law (art. IX-C) was enacted, not only to define “ medical expense indemnity ” and “ hospital service ” (§ 250) but also to set forth expressly the provisions of the Insurance Law, other than those contained in article IX-C, to which medical expense indemnity and hospital service corporations should be subject (§ 251, subd. 1). These corporations were not made subject to article IV which contains subdivision 3 of section 46 defining " accident and health ’ ’ insurance. The provisions governing “medical expense indemnity” companies such as United Medical Service are entirely different. "Medical expense indemnity ” is defined in section 250 of the Insurance Law and the provisions which must be contained in its contracts are set forth in section 253 of the Insurance Law.
Sickness and accident (i.e., accident and health) insurance, therefore, is a type of insurance distinct from nonprofit “ medical expense indemnity.” There are reasons of public policy why the City Charter provision should have been limited to “ sickness or accident insurance ”. Companies issuing sickness and accident insurance policies can operate for profit, whereas companies issuing medical expense indemnity policies cannot, (Insurance Law, § 250; Membership Corporations Law, § 2.) It is fitting that they should not be burdened with expenses created only by the existence of the insurance itself. The only effect of such payments would be to load increased rates on the general public without its acquiescence. A medical expenses *219 indemnity contract is ian " indemnity ’ ’ contract, i.e., one which insured the subscriber against actual expense. On the other hand, a health and accident policy is not an indemnity contract and benefits may be due thereunder even though no actual loss has been incurred. Thus under a sickness and accident policy the benefit (and the premium) may be based upon the occurrence of an event (accident or illness) rather than the occurrence of an expense or loss. However, where indemnity insurance written by a nonprofit corporation is involved, and where the benefit (and the premium) is based on the stipulation that actual expense, be incurred, it would be wrong to charge against such insurance an expense which had been provided for by the contract by which the college was allowed the use of the tax supported hospital facilities.
The orders of the Appellate Division unanimously affirming the judgments of the trial court dismissing the complaints should be affirmed, with costs.